UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X          Index No.:

KEISHA RAYSIDE,

                              Plaintiff,

                                                                              **COMPLAINT**

             -against-

EASTERN CONNECTION OPERATING, INC.,
individually and d/b/a DICOM,                                     Plaintiff Demands a
                                                                    Trial By Jury

                              Defendant.
-----------------------------------------------------------------X

Plaintiff, Keisha Rayside, by and through her attorneys, Phillips & Associates, PLLC, hereby

complains of the Defendant, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to the New York Executive Law and the New York City

    Administrative Code seeking damages to redress the injuries Plaintiff has suffered as a result of

    being harassed and discriminated against by Defendant on the basis of her sex/gender and sexual

    orientation, together with sexual harassment, creating a hostile work environment, unequal pay

    on the basis of gender, and retaliation.

## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity of

    citizenship and the matter in controversy exceeds, exclusive of interest and costs, the sum of

    $75,000.00.

3. Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claims occurred within the Eastern District of the State of New York.  28 U.S.C. §1391(b).

## PARTIES

4. Plaintiff is a 33-year-old female, homosexual resident of the State of New York, County of Kings.

5. At all times material, Defendant EASTERN CONNECTION OPERATING, INC., individually and d/b/a DICOM (hereinafter "DICOM") was and is a foreign business corporation duly existing under the laws of the State of Delaware.

6. Defendant DICOM is a parcel delivery company which maintains corporate headquarters in the State of Rhode Island.

7. At all times material, Defendant DICOM was and is a foreign business corporation authorized to conduct business in the State of New York.

8. At all times material, Defendant DICOM was and is a foreign business corporation which does conduct business in the State of New York.

9. At all times material, Plaintiff was employed by Defendant DICOM.

## MATERIAL FACTS

10. In or around January 2015, Plaintiff began working for Defendant DICOM as a "Driver/Contractor" for the company's New York region.  Plaintiff was responsible for picking up packages from Defendant's warehouse and delivering them to customers throughout Long Island and New York City.  Defendant DICOM's warehouse was originally located in Long Island City and was relocated to Hicksville in or around early 2018.

11. Throughout almost the entirety of Plaintiff's employment, with the exception of two female

2

employees who are in their 50s and 60s, Plaintiff was the only female employed at Defendant's Long Island City or Hicksville location out of a group of 80 employees. The lack of gender diversity, coupled with the absence of any harassment or discrimination training, created a perilous discriminatory work environment for Plaintiff.

12. Since the beginning of her employment, on almost a daily basis, Plaintiff was subjected to unwanted touching and/or sexually harassing comments by numerous male coworkers in plain view of the entire staff, including management.

13. For example, on almost a daily basis, **Defendant DICOM's driver, Jose (last name currently unknown), would repeatedly rub and/or grab Plaintiff's buttocks while telling her that he wanted to have sex with her.** Each time Jose saw Plaintiff, he would also inappropriately comment on Plaintiff's physical appearance and attire, including, for example, telling Plaintiff, "**You look sexy**" and "**I wish I could be your tights.**" Plaintiff repeatedly begged Jose to stop and told him that his actions constituted sexual harassment. Nevertheless, emboldened by Defendant DICOM's sexually discriminatory culture, Jose continued to sexual harass Plaintiff.

14. On multiple occasions, Jose would say to Plaintiff, "**Oh my God Keisha, look what you are doing to me**," **or words to that effect and point to his erection.**

15. On one occasion, in or around August 2018, Plaintiff was in the "print out room" with approximately six other drivers and Defendant DICOM's Dispatcher/Supervisor, Donna (last name currently unknown). Unbeknownst to Plaintiff, her leggings had a small tear near her right buttocks. **In front of the entire room, Jose put his finger through the hole and proceeded to rub Plaintiff's buttocks under her leggings.** Plaintiff immediately pulled away from Jose and shouted that his conduct was sexual harassment. Not a single employee came to Plaintiff's defense or admonished Jose for his inappropriate conduct.

16. **On almost a daily basis, Defendant DICOM's driver, Willy (last name currently unknown), would also make sexual comments toward Plaintiff and engage in unwanted touching, including grabbing and/or rubbing Plaintiff's buttocks and vagina.**

17. By way of example, in or around September 2018, as Plaintiff was standing, **Willy approached Plaintiff from behind and pressed his erection against her buttocks and asked,** "**Do you feel it?**" Plaintiff was humiliated and disgusted by Willy's conduct and immediately pulled away.

18. In or around early November 2018, Plaintiff was sitting in the print out room with Willy and Donna.  Plaintiff was seated in a chair with her hands resting on her lap between her legs.  Willy proceeded to reach for Plaintiff's hand under the guise of greeting her, but instead, **purposefully touched Plaintiff's vagina.**

19. In or around November 2018, while Plaintiff was in the office with Willy and another coworker, Kiody (last name currently unknown), Willy told Plaintiff, "**I want to fuck you in the ass**," (in English) and proceed to continue speaking about Plaintiff in Spanish.  When Plaintiff asked Kiody to translate, Kiody refused because Willy's comments were "too inappropriate."

20. Defendant's discriminatory conduct was so widespread that employees who Plaintiff did not even know would routinely ask her out on dates, take bets on who could get Plaintiff's telephone number, and proposition her for sex.  For example, on one occasion, in or around late 2018, a warehouse employee told Plaintiff that he wanted her to have a threesome with him and his girlfriend.  Other employees would cat-call at Plaintiff and openly shout, "Hey sexy," as Plaintiff walked by, making Plaintiff feel humiliated and degraded on a daily basis.  Defendant DICOM employees would also repeatedly tell Plaintiff that she has a "**nice body**," "**big ass**," "**big boobs**," and "**look[s] sexy in [her] tights**."

21. Although Defendant DICOM's supervisors and managers witnessed the sexually harassing

conduct toward Plaintiff, they did not take any remedial action because they believed that Plaintiff was "assuming the risk" of sexual harassment by working in a male dominant environment. Additionally, supervisors and managers were afraid to enact discipline because some of the male employees were ex-convicts and physically intimidating.

22. The above are just some examples of the severe and pervasive sexual harassment endured by Plaintiff at Defendant DICOM's workplace.

23. Defendant DICOM also engaged in a pattern and practice of discriminatory conduct toward Plaintiff by giving male employees more hours and preferential delivery routes.

24. For example, during Plaintiff's first year of employment, Plaintiff needed to wait approximately one year to obtain a regular delivery route. During this first year, Plaintiff was required to call Defendant's office each day to determine whether they had work available for her; on average, Plaintiff worked approximately two days per week. In or around early 2016, after approximately one year of employment, Plaintiff obtained a regular delivery route in New York City and began working five days per week.

25. By contrast, numerous male employees were given regular delivery routes immediately upon their hire. In fact, in or around early 2016, Mark (last name currently unknown), was hired as a driver by Defendant DICOM. Rather than making Mark wait for an available delivery route, **Defendant DICOM's former manager, John O'Hare, stripped Plaintiff of her New York City delivery route because she is a woman and gave it to Mark instead.** When Plaintiff complained to Mr. O'Herd that she was being treated unfairly, he simply replied, "Life isn't fair."

26. Accordingly, for the next six months, Plaintiff was once again required to search for available jobs on a daily basis and worked an average of two days per week, resulting in a reduction in

pay.

27. In or around the fall of 2017, Plaintiff was offered a Long Island delivery route ("J04"), however, after several months, Plaintiff was forced to split her route with Jose, because his assigned route was having a "slow period," and he wanted more work. Accordingly, Plaintiff was once again denied full-time employment on the basis of her gender, resulting in a reduction in pay.

28. In or around mid-2018, Plaintiff was offered another route in Long Island ("J09") after two other male employees rejected the position. J09 was viewed as the most undesirable route because it required employees to drive extremely long distances at employees' own expense. However, because Plaintiff was desperate for full-time work, she accepted the position.

29. As even more examples of its discriminatory practices, Defendant DICOM would force Plaintiff to adhere to certain protocols, while bending the rules for male employees. For example, Defendant DICOM's drivers were permitted to independently contract additional drivers or helpers to assist with deliveries; a majority of these individuals were already employees of Defendant DICOM's Hicksville warehouse. Pursuant to company protocol, if a DICOM driver contracted another driver or helper, another DICOM driver was not permitted to hire them in the future. Although this rule was strictly enforced against Plaintiff, male employees were permitted to hire drivers/helpers who resigned or were discharged by Plaintiff.

30. For example, on or about July 23, 2018, Plaintiff hired Darren Raymond for a six-month contract, as a driver for her delivery route. However, after three months, in violation of company protocol, Darren resigned from his position with Plaintiff and began working for Jose instead. When Plaintiff tried to prevent Darren from working with Jose, Darren began telling numerous employees that Plaintiff was gay (after he overheard Plaintiff speaking with her girlfriend), even though he knew Plaintiff wanted to keep her sexual orientation confidential.

6

31. On or about September 10, 2018, Plaintiff complained to Defendant DICOM's Manager, Ken Rochler ("Rochler") that Jose had hired Darren in violation of company policy. Rochler agreed that it was unfair but stated that there was nothing he could do about it, irrespective of the fact that he was a manager. When Plaintiff voiced her complaints that she felt the policy was being discriminatorily enforced because the company was "male dominant," Rochler ignored Plaintiff's concerns and reiterated that he could not do anything.

32. On or about October 3, 2018, Plaintiff hired Defendant DICOM's employee, Tommy also known as "Star" (last name currently unknown), as a helper to assist her with unloading packages. Although Tommy accepted the position, during the delivery route, he became enraged when he was required to take direction from Plaintiff (because she is a woman) and repeatedly screamed and cursed at her. Tommy specially told Plaintiff, "**I don't like it when women tell me what to do or speak to me**." To humiliate and demean Plaintiff, Tommy further told Plaintiff that all the guys at the warehouse would talk about her in a sexual manner.

33. On or about October 5, 2018, Tommy became enraged because Plaintiff had not yet paid him for his work on October 3, irrespective of the fact that Plaintiff informed Tommy that she would leave the money with Defendant DICOM's Supervisor, Kevin (last name currently unknown), that very evening. At approximately 7:00 pm, as Plaintiff was on her way back to the warehouse after finishing her deliveries, Tommy called Plaintiff and shouted, "**Suck my dick**" and "**I will fuck you until you turn straight**;" Plaintiff could hear other male employees laughing in the background. In response, Plaintiff told Tommy that she would call the police if his conduct escalated. Immediately thereafter, Plaintiff hung up the phone and called Kevin to report the incident, however, Kevin did not take any remedial action.

34. In fact, shortly after the telephone conversation, Tommy sent Plaintiff two threatening text

messages which read, "**When I see ya stank gay ass talk that shit to my face bitch you got the rite one I will violate hoe**" and "**Suck my dick tell the cops you oh [sic] me money you broke bum bitch.**"

35. When Plaintiff arrived at the warehouse at approximately midnight, Tommy continued to harass and physically threaten Plaintiff in person.  Tommy began repeatedly shouting at Plaintiff, "**Suck my dick**" in an aggressive manner.  Approximately ten male employees, including Kevin and another supervisor, Mahrina (last name currently unknown), witnessed Tommy continue to berate Plaintiff and repeatedly refer to her as "**Bitch**," "**Dyke**," and "**Stupid Stank Hoe**." Tommy also threatened to "**Bring [his] girlfriend over to slap this bitch and fuck this bitch up (referring to Plaintiff)**," and told Plaintiff, "**You need dick.  Maybe you should start to take fucking dick.  You should shut up before I make you suck my dick.**"  Plaintiff was crying and visibly terrified.  Nevertheless, none of the supervisors or employees did anything to help Plaintiff or deescalate the situation.  In fact, numerous male employees laughed while Tommy was threatening Plaintiff.

36. Fearing for her safety, Plaintiff called the police to protect herself from Tommy.  However, when the police arrived, Tommy hid in the back of the warehouse.  When the police questioned the other employees, they falsely stated that they did not know Tommy and did not witness the situation.  When Plaintiff asked Kevin why he did not speak to the police, Kevin replied, "**I can't be a snitch.**"

37. As a result of the events of October 5, 2018, Plaintiff suffered severe emotional distress and psychological trauma and contemplated suicide.

38. On the following day, Plaintiff reported the incident to Rochler, including showing him the text messages from Tommy and playing an audio recording in which Tommy could be heard

screaming at Plaintiff. In response, Rochler told Plaintiff that he would address the situation and speak with Tommy.

39. However, neither Rochler nor anyone at Defendant DICOM investigated the matter or took any remedial action. In fact, to this day, Tommy remains employed by Defendant DICOM and continues to work in the same facility as Plaintiff, causing Plaintiff to continually fear for her safety and suffer further emotional distress.

40. On or about December 10, 2018, as a result of Defendant DICOM's ongoing discriminatory conduct, Plaintiff's attorney sent a letter with a draft complaint to Defendant expressing Plaintiff's intent to pursue legal action.

41. Shortly thereafter, rumors began to circulate regarding Plaintiff's intended lawsuit, resulting in employees retaliating against Plaintiff, including acts of physical violence.

42. For example, in or around late December 2018, Willy walked passed Plaintiff and purposefully hit Plaintiff with his shoulder with such force that it caused Plaintiff to drop what she was holding.

43. **On or about February 8, 2019, after Plaintiff drove away from Defendant's warehouse, Plaintiff had to pull over to the side of the road multiple times because she heard a strange noise coming from her tires. Plaintiff ultimately stopped at an auto mechanic shop where she was told that *four* lug nuts were removed from her wheels. The mechanic told Plaintiff that the lug nuts could not have fallen off and were likely removed using a wrench. Plaintiff was terrified that a DICOM employee had attempted to injure or kill her in a motor vehicle accident.**

44. In addition to sustaining severe emotional distress damages, Plaintiff also sustained economic damages because she was required to completely replace a tire and rim on her van.

9

45. Immediately after speaking with the mechanic, Plaintiff called Defendant DICOM's dispatcher, Sam (last name currently unknown), to report the incident and inform him that she could not complete her delivery route.  Plaintiff told Sam that she believed someone was trying to sabotage her and that she could have died in a car accident.

46. As even more evidence of Defendant DICOM's retaliatory conduct, after learning of Plaintiff's intended lawsuit, Plaintiff's supervisors began to ignore Plaintiff and/or micromanage her work in an effort to create a pretextual reason to terminate her.  On multiple occasions, in response to requests for assistance, Plaintiff was told, "I don't want to talk" and "I don't care about your lawyers."

47. In addition to the retaliatory conduct, Plaintiff continues to endure sexual harassment by male employees.  Defendant DICOM operates a Staples department in its warehouse.  DICOM employees assigned to the Staples department are responsible for sorting and loading packages.  Sometime in or around January 2019, the Staples department was relocated next to Plaintiff's work area.  Immediately thereafter, and despite Plaintiff's repeated refusals, several male employees assigned to the Staples department would ask Plaintiff out on dates, ask Plaintiff for her telephone number, and tell Plaintiff that they were interested in a romantic relationship with her.

48. In or around January or February 2019, one of the male employees (name currently unknown) in the Staples department told Plaintiff, **"You have horse legs."**  When Plaintiff gave him a disproving look, he responded, **"Don't worry.  It's nothing bad.  It just means you could ride dick."**  Immediately thereafter, within Plaintiff's earshot, the employee repeated his statements to another male coworker, and they both laughed.

49. On or about March 20, 2019, in order to further retaliate against Plaintiff, a female employee,

10

Cheryl (last name currently unknown) in the Staples department refused to provide Plaintiff with the keys to the restroom, which was normal protocol for using the employee restroom. Even after multiple requests, Plaintiff was refused entry to the restroom, causing her to almost urinate in her clothing. Only after Plaintiff requested the key from a new employee, was she given access to the restroom.

50. The above are just some examples of Defendant's heinous acts of discrimination and retaliation.

51. Defendant's actions created a working environment that no reasonable person would tolerate.

52. Defendant's actions were intended to constructively discharge Plaintiff.

53. Defendant would not have harassed and discriminated against Plaintiff but for his sex/gender and sexual orientation.

54. Defendant willfully paid Plaintiff less than her male counterparts because she is a woman.

55. As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

56. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress and physical ailments.

57. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of partial income, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

58. As Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against Defendant.

**AS A FIRST CAUSE OF ACTION**
**UNDER NEW YORK STATE LAW**
**DISCRIMINATION**

59. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

60. Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

61. Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex/gender and sexual orientation, together with sexual harassment, creating a hostile work environment, and unequal pay on the basis of gender.

62. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of Executive Law Section 296.

**AS A SECOND CAUSE OF ACTION**
**UNDER NEW YORK STATE LAW**
**RETALIATION**

63. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

64. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

65. Defendant engaged in unlawful employment practices prohibited by the New York State Executive Law by retaliating and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to Defendant's unlawful employment practices.

**AS A THIRD CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**DISCRIMINATION**

66. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

68. Defendant engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of her sex/gender and sexual orientation, together with sexual harassment, creating a hostile work environment, and unequal pay on the basis of gender.

## AS A FOURTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## <u>RETALIATION</u>

69. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

70. The New York City Administrative Code Title 8-107(7) provides that:

"It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

71. Defendant engaged in unlawful employment practices by retaliating, and otherwise discriminating against Plaintiff because of her opposition to Defendant's unlawful employment practices.

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by the New York Executive Law and the New York City Administrative Code, and that the Defendant harassed and discriminated against Plaintiff on the basis of her sex/gender and sexual orientation, together with sexual harassment, creating a hostile work environment, unequal pay on the basis of gender, and retaliation;

B. Awarding damages to the Plaintiff, for all lost wages and benefits, past and future, back pay and front pay and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D. Awarding Plaintiff punitive damages;

14

E.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendant's unlawful employment practices.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendant in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  New York, New York
March 27, 2019

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

By: _____/s/_____
Erica L. Shnayder, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, NY 10004
Tel: 212-248-7431
Fax: 212-901-2107
Email: eshnayder@tpglaws.com

15